FILED

2007 Feb-12  PM 01:32
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

EMPLOYERS MUTUAL      )
CASUALTY COMPANY, INC.,      )
     )
     **Plaintiff,**      )
     )
vs.      )      **Civil Action No. CV-05-S-1854-NW**
     )
TOWN OF LEIGHTON,      )
ALABAMA; JAMIE SIMS; and      )
TAMMY VINES;      )
     )
     **Defendants.**      )

## MEMORANDUM OPINION

This diversity jurisdiction declaratory judgment action is before the court on plaintiff's motion for summary judgment.[1]  For the reasons set forth herein, the motion will be granted in part and denied in part.  Further, one request for declaratory relief will be dismissed *sua sponte* because the issue raised is not ripe for a decision at this time.

### PART ONE

*Summary Judgment Standards*

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment

---

[1] Doc. no. 12 (Plaintiff's Motion for Summary Judgment).  *See also* doc. no. 13 (Plaintiff's Brief in Support of Summary Judgment); doc. no. 14 (Plaintiff's Evidentiary Submission in Support of Summary Judgment).

not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

## PART TWO

*Summary of Relevant Facts*

Plaintiff, Employers Mutual Casualty Company, Inc. ("Employers Mutual"), brought this declaratory judgment suit against two of its insureds, the Town of Leighton, Alabama, and Jamie Sims, formerly a peace officer with the Leighton Police Department.[2]  Additionally, Employers Mutual named as a defendant Tammy Vines, the plaintiff in a collateral state court tort action against the Town of Leighton and Sims.[3]  As the insurer for Leighton and Sims under two policies of liability insurance,[4] Employers Mutual is currently defending the state court proceeding on their behalf, and stands ready to satisfy any judgment that may be entered against them, up to the monetary limits set by the policies.[5]  In the meantime, however, Employers Mutual has requested that this court enter an order declaring that it has no legal obligation to either defend or indemnify the insureds, and permitting it to immediately withdraw from involvement in the underlying litigation.[6]

## A.    The State Court Lawsuit

The state court suit arises out of allegations by Vines that, on May 30, 2003, while she was peacefully sitting in her vehicle videotaping the manner in which then-

---

[2] Doc. no. 1 (Complaint).

[3] *Id*.  *See also* doc. no. 14, Ex. 3 (State Court Complaint).

[4] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶¶ 1, 2.

[5] *See*, *e.g.*, doc. no. 15 (Defendants' Response in Opposition to Summary Judgment), p. 8.

[6] Doc. no. 1.  *See also* doc. no. 18 (Plaintiff's Reply in Support of Summary Judgment), pp. 12-13.

Officer Sims conducted a traffic stop of another motorist, Sims approached her, seized her video camera and threw it to the ground, and then forcibly arrested her against her will.[7]   Once arrested, Vines alleges that her car and camera were impounded, and that she was booked in a local jail on charges of resisting arrest and obstructing governmental operations.[8]  The incident allegedly left Vines "bruised and contused" and in need of medical care;[9] her video camera was returned without the tape and in a permanently damaged condition;[10] and she faced a court date for charges that were eventually dismissed when Sims failed to appear to testify against her.[11] Vines has sued in state court for unconstitutional deprivations of her liberty and property under the Civil Rights Act of 1871, 42 U.S.C. § 1983, claiming both that Sims' actions were pursuant to official Town of Leighton policies or customs, and that the Town failed to properly train and/or supervise Sims.[12]  Vines also asserts state law claims for negligence, false arrest and imprisonment, assault and battery, and malicious prosecution.[13]

---

[7] Doc. no. 14, Ex. 3, ¶¶ 6-7.

[8] *Id.* at ¶¶ 7-8, 10-11.

[9] *Id.* at ¶ 14.

[10] *Id.* at ¶ 10.

[11] *Id.* at ¶ 12.

[12] *Id.* at Count I.  *See also id.* at ¶¶ 15, 17-18.

[13] *Id.* at Counts II-V.

Before Vines filed the state court lawsuit, however — and in accordance with Alabama Code § 11-47-192 — she filed a Notice of Claim with the Town of Leighton, "detailing her allegations against [Sims] and her intention to file a lawsuit against [Sims] and [the] Town."[14]  As damages, Vines demanded payment of $500,000.[15]  The Notice of Claim was filed on November 17, 2003, just under six months after Vines' arrest, and the Town Clerk signed it, acknowledging receipt, on November 24, 2003.[16]

Despite receiving this notice, the Town of Leighton did not notify Employers Mutual of Vines' claim for damages at that time.[17]  (Sims, who had resigned from the Leighton Police Department the previous July, was apparently not made aware of the pendency of Vines' Notice of Claim.[18])  In fact, Employers Mutual was not informed of the claim until July 8, 2005, after Vines had filed a lawsuit.[19]  In other words, Employers Mutual was notified approximately three weeks after Vines served her state court complaint upon the Town, almost two weeks after Sims received service

---

[14] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶ 11.

[15] Doc. no. 14, Ex. 4 (Notice of Claim), ¶ 5.

[16] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶¶ 11-12.

[17] *Id.* at ¶ 13.

[18] Doc. no. 15, Ex. 2 (Affidavit of Jamie Sims), pp. 1-2.

[19] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶ 13

of that pleading,[20] and over nineteen months after the Town had received the Notice of Claim demanding $500,000.  It is primarily on the basis of this late notice that Employers Mutual argues it is not obligated to provide insurance coverage to the Town of Leighton.[21]  Additionally, Employers Mutual asserts that it owes no duties to either the Town *or* Sims because the conduct alleged by Tammy Vines as the basis for her state court claims falls outside the scope of the coverage contemplated by the policies.

## B.    The Policies and Pertinent Provisions

As mentioned, two insurance policies are at issue here.  The first is a "Commercial General Liability Policy" ("CGL Policy"), and the second is referred to by Employers Mutual as a "Linebacker Policy."[22]  The Town of Leighton actually is the named insured on both the CGL and Linebacker Policies, but Employers Mutual evidently concedes that Sims is an additional insured under the terms of

---

[20] Doc. no. 15, Defendants' Statement of Additional Undisputed Facts, ¶¶ 14-15.

[21] In its original brief in support of summary judgment, Employers Mutual also argued that the failure to give notice relieved it of any duty to provide coverage for Sims.  Doc. no. 13, p. 13. It appears, however, that after defendants responded with an affidavit from Sims stating that he no longer worked for the Town and was unaware of the Notice of Claim that was filed with the Town Clerk following his resignation, Employers Mutual abandoned this argument.  Although there is no explicit concession on that issue, Employers Mutual's reply brief reasserts every argument against coverage that was asserted in the initial brief *except* that Sims breached the notice provision.  *See generally* doc. no. 18.  In any event, no evidence has been offered to contradict Sims' sworn statement that he was blamelessly unaware of the Notice of Claim.

[22] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶¶ 1-2.

each.[23]  Substantively, the policies protect the insureds against different risks.

### 1.    The CGL Policy

The CGL Policy is divided into several categories of "coverages." Relevant here are "Coverage A – Bodily Injury and Property Damage Liability," and "Coverage B – Personal and Advertising Injury Liability."[24]  Under Coverage A, Employers Mutual agrees to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and also to "defend the insured against any 'suit' seeking those damages."[25]  These dual obligations only arise, however, if "[t]he 'bodily injury' or 'property damage' is *caused by* an 'occurrence,'"[26] meaning "an accident."[27] Pursuant to Coverage B of the CGL Policy, Employers Mutual assumes the same duties of indemnification and defense as under Coverage A, but only when the underlying claim is for "personal and[/or] advertising injury" — a phrase that is

---

[23] An independent review of the policies seems to confirm this supposition.  With respect to the CGL Policy, Sims appears to be covered under Section II(2)(a), which provides that the named insured's "'employees' [are also insured]. . . but only for acts within the scope of their employment by [the named insured] or while performing duties related to the conduct of [the named insured's] business."  Doc. no. 14, Ex. 1 (CGL Policy), p. 9.  As for the Linebacker Policy, Sims falls under the definition of "insured," which expressly includes "[e]mployees of the 'organization' while acting within their scope of duties while conducting the business of the 'organization.'"  *Id*. at Ex. 2 (Linebacker Policy), p. 2.

[24] *See id*. at pp. 1, 5.

[25] *Id*. at Ex. 1, p. 1.

[26] *Id*. (emphasis supplied).

[27] *Id*. at p. 14.

defined as "injury, including consequential 'bodily injury,' arising out of [*inter alia*] . . . [f]alse arrest, detention or imprisonment . . . [and] malicious prosecution."[28]

Significantly, both Coverage A and Coverage B of the CGL Policy are subject to an endorsement referred to as the "Law Enforcement Activities" exclusion.[29] Because of this endorsement, the CGL Policy does not apply to "bodily injury" or "personal and advertising injury" that "aris[es] out of any act or omission resulting from law enforcement activities of [the Town's] police department or any of [the Town's] law enforcement agencies, including their agents or 'employees.'"[30]  While the term "law enforcement activities" is not defined, the endorsement specifically disclaims coverage for "bodily injury" resulting from either of two discrete functions: *i.e.*, "attempting to make an arrest" and "holding someone under arrest."[31]  And, although the "Law Enforcement Activities" exclusion does not apply to "property damage" under Coverage A, another exclusion enumerated within the CGL Policy itself precludes coverage for "'bodily injury *or* 'property damage' *expected or intended* from the standpoint of the insured."[32]

## 2.    The Linebacker Policy

---

[28] *Id.*

[29] Doc. no. 14, Ex. 1, Law Enforcement Activities Endorsement.

[30] *Id.*

[31] *Id.*

[32] *Id.* at Ex. 1, p. 2 (emphasis supplied).

The Linebacker Policy provides for defense against claims or civil lawsuits alleging "wrongful acts" by an insured, and indemnification for any sum the insured "is legally obligated to pay as compensatory damages" as a result of such claims or lawsuits.[33]   The definition of "wrongful acts," as amended and expanded by the "Personal Injury Endorsement," is as follows:

1.    actual or alleged errors;
2.    misstatement or misleading statement;
3.    act or omission or neglect or breach of duty by an "insured"; [and/or]
4.    "Personal Injury"

in the discharge of "organization[al]" duties.[34]

The term "personal injury," in turn, is defined as:

1.    Injury, other than "Bodily Injury," arising out of one or more of the following offenses:

   a.    False arrest, detention or imprisonment;
   b.    Malicious prosecution;
         . . .
   f.    Violation of constitutional / civil rights or improper service of process as it relates solely to the "organization's" law enforcement activities.

2.    "Bodily injury" arising while the insured:

   a.    is attempting to make an arrest; [and/or]

---

[33] Doc. no. 14, Ex. 2, p. 1.

[34] *Id*. at Personal Injury Endorsement.

      b.     is holding someone under arrest[.][35]

Essentially, this broader definition of "personal injury" means that the Linebacker Policy covers harms resulting from the exact same conduct that is excluded by the CGL Policy's "Law Enforcement Activities" exclusion.  This is not to imply, however, that the Linebacker Policy is limitless in scope.  To the contrary, several specific exclusions circumscribe the coverage available.  First, the Linebacker Policy does not apply to "bodily injury" except as stated in the "personal injury" definition — *i.e.*, where the "bodily injury" results from an attempt to make an arrest or efforts to hold someone under arrest.[36]  Second, the Linebacker Policy does not confer any right to coverage for claims of "property damage,"[37] including "physical injury to tangible property."[38]  Third, and finally for present purposes, the Linebacker Policy excludes coverage of "intentional illegal acts" where:  (1) "[the] [i]llegality was known prior to commitment of the act"; or (2) "[c]orrective steps were not taken after the illegality of the act was determined."[39]

### 3.    The Notice Provisions

Both policies require, as an explicit condition precedent to coverage, that the

---

[35] *Id*. at Ex. 2, p. 3.

[36] *Id*. at p. 4.

[37] *Id*.

[38] *Id*. at p. 3.

[39] *Id*. at p. 4.

named insured provide prompt notice to Employers Mutual immediately following the occurrence of a covered event or interposition of a claim by a third-party. More specifically, under the heading "conditions," the CGL Policy states as follows:

**2.     Duties In The Event Of Occurrence, Offense, Claim Or Suit**

  **a.**  You must see to it that we are notified as soon as practicable of an "occurrence" or an offense *which may result in a claim*. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

    **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

  **b.**  If *a claim is made* or "suit" is brought against any insured, you must:

    **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

    **(2)** *Notify us as soon as practicable.*

  **c.**  You and any other involved insured must:

    **(1)** Immediately send us copies of any *demands*, *notices*, summonses or *legal papers* received in connection with the *claim or "suit"* . . . .[40]

Similar notice provisions are to be found under in the "conditions" section of

---

[40] Doc. no. 14, Ex. 1, pp. 10-11 (italics supplied, boldface and capitalization in original).

the Linebacker Policy:

   **A.    Your duties in the event of a "wrongful act" that may involve this policy**

    1.    We or our agent must have *prompt written notice* from you or someone on your behalf of any "wrongful act" *that may involve this policy*.  The notice should identify this policy and give us the facts of the "wrongful act" including names and addresses of claimants and witnesses.

    2.    If you receive "suit" papers, you agree to *immediately* furnish us with a copy *as well as copies of any other papers pertinent to the* "*wrongful act*."[41]

**PART FOUR**

*Choice of Law*

At the outset, the court must confront an issue not briefed by the parties:  that is, what jurisdiction's law governs the outcome in this case?  As a general matter, the Supreme Court of the United States commands that, where diversity of citizenship is the basis of jurisdiction, the district court is to apply the substantive law — including the choice of law rules — of the state in which it sits.  *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941).  *See also generally Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).[42]

Employers Mutual's sole prayer in its complaint is for a declaratory judgment

---

[41] *Id*. at Ex. 2, p. 5 (italics supplied, boldface in original).

[42] The policies at issue do not contain any choice of law provisions.

setting forth the parties' rights and responsibilities under two contracts of liability insurance.  Alabama follows the doctrine of *lex loci contractus*, which provides that contract disputes are adjudicated according to the law of the place where the contract was executed.  *E.g.*, *Harrison v. Insurance Company of North America*, 318 So. 2d 253, 257 (Ala. 1975) (citing *Furst & Thomas v. Sandlin*, 94 So. 740 (1922)).  *See also Twin City Fire Insurance Company v. Colonial Life & Accident Insurance Company*, 124 F. Supp. 2d 1243, 1247 (M.D. Ala. 2000).  "In the context of insurance cases, the court is obliged to apply the laws of the state where the last act is 'receipt and acceptance' of the insurance policy."  *American Motorists Insurance Company v. Southern Security Life Insurance Company*, 80 F. Supp. 2d 1280, 1282 (M.D. Ala. 2000).  *See also Industrial Chemical & Fiberglass Corporation v. North River Insurance Company*, 908 F.2d 825, 829 n.3 (11th Cir. 1990).

Unfortunately, here, the parties have not included any evidence at all that reveals where receipt and acceptance of the policy took place.  Indeed, they have not even mentioned the choice of law issue in their briefs.  On the other hand, the named insured is an Alabama municipality, and the producing agent for the policies also is located in this state.[43]  Also, both sides have cited almost exclusively Alabama cases, and have represented to the court that these cases are dispositive.  The court,

---

[43] *See* doc. no. 13, Ex. 1; *id*. at Ex. 2.

therefore, will assume (but not hold) that Alabama law applies.

### PART FOUR

*Duty to Defend — CGL Policy*

As mentioned, both policies at issue in this case contain defense clauses and indemnification clauses. The court begins its substantive discussion with the defense provisions, for "the duty to defend is 'more extensive' than the duty to indemnify." *Hartford Casualty Insurance Company v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1009 (Ala. 2005) (quoting *U.S. Fidelity & Guaranty Company v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985)). What is more, since the defense obligation is broader than the indemnification duty, "where there is no duty to defend there cannot arise a duty to indemnify." *United National Insurance Company v. Dunbar & Sullivan Dredging Company*, 953 F.2d 334, 338 (7th Cir. 1992) (applying Illinois law).

**A.    The Town of Leighton**

**1.    Failure to provide notice of claim**

Employers Mutual's leading argument is that the Town of Leighton is due no defense under the CGL Policy because the Town failed to inform Employers Mutual of Vines' demand for $500,000 until over nineteen months following receipt of her Notice of Claim and even longer after Vines' actual arrest. The notice provision in

-14-

the CGL Policy states, in part, that "[y]ou must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim."[44]  The Town offers several arguments for why it was not obligated to inform Employers Mutual of the "occurrence" that gave rise to the claims in this lawsuit.  The court sees no point in relating those explanations here, however, because another portion of the notice provision requires prompt disclosure of *claims*, separate and apart from disclosure of *occurrences*.  Specifically, the policy ordains that, "[i]f *a claim* is made or 'suit' is brought against any insured, you must . . . [n]otify us as soon as practicable" and "see to it that we receive written notice of *the claim* or 'suit' as soon as practicable."[45]

Notice provisions such as this are common features of liability insurance policies, and the Supreme Court of Alabama has treated the issue of delay on multiple occasions.  The well-settled rule in this state is that,

> [where] *notice of the accident* and *forwarding of any demand*, *notice*, summons or other process are specifically made a condition precedent to any action against the insurer, the failure to give a *reasonably timely* notice of the accident or of the receipt of any demand, notice, summons or other process will release the insurer from the obligations imposed by the contract, *although no prejudice may have resulted*.

*American Fire & Casualty Company v. Tankersley*, 116 So. 2d 579, 582 (Ala. 1959)

---

[44] *Id*. at Ex. 1, p. 10.

[45] *Id*. at p. 11 (emphasis supplied).

(emphasis supplied).[46]   "'The requirement of notice 'as soon as practicable' means that the insured must give notice 'within a reasonable time under all the circumstances.'"   *U.S. Fidelity & Guaranty Company v. Baldwin County Home Builders Association*, *Inc.*, 770 So. 2d 72, 75 (Ala. 2000) (quoting *U.S. Fidelity & Guaranty Company v. Bonitz Insulation Company*, 424 So. 2d 569, 572 (Ala. 1982)). *See also Southern Guaranty Insurance Company v. Thomas*, 334 So. 2d 879, 882 (Ala. 1976) (observing that the same rule applies to equivalent terms such as "immediately"); *Pan American Fire & Casualty Company v. DeKalb-Cherokee Counties Gas District*, 266 So. 2d 763, 771 (Ala. 1972) (noting that "[t]he exact phraseology used apparently makes very little, or any, difference").

The court notes that the reasonableness requirement, although strictly enforced, is not overly rigid.  That is, the totality inquiry provides a basis for consideration of excuses or "mitigating circumstances." *Baldwin County Home Builders Association*, 770 So. 2d at 76.  It is the insured, however, who bears the burden of proving

---

[46] The Town does not dispute, and in any case it is quite clear, that the notice provision in the CGL Policy constitutes a condition precedent.  The requirements are listed under the "conditions" heading, and the mandatory injunction "must" is used throughout.  Additionally, a separate provision states that the insurance company may not be sued for coverage unless there is full compliance will all conditions stated in the policy.  These factors indicate the intent of the parties to require notice as a precondition to any reciprocal duty on the part of the insurer. *See Fidelity & Casualty Company of New York v. DeLoach*, 195 So. 2d 789, 793 (Ala. 1967) ("Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument.").

reasonable justification for failing to comply with a notice or demand-forwarding requirement in a policy of liability insurance. *See*, *e.g.*, *id.* at 75 (citing *Thomas*, 334 So. 2d at 882-83). Moreover, when evaluating a given excuse, "there are only two factors to consider: the length of the delay and the reasons for the delay." *Aetna Insurance Company v. Spring Lake*, *Inc.*, 350 So. 2d 397, 400 (Ala. 1977). The court easily concludes that, standing alone, a nearly twenty month delay in reporting a claim is unreasonable. *Cf.*, *e.g.*, *id.* ("It is without doubt that a delay of over two years from the time of the accident to the time of notice is unreasonable, absent extenuating circumstances."). *See also Pharr v. Continental Casualty Company*, 429 So. 2d 1018, 1019-20 (Ala. 1983) (holding that eight month delay from time of lawsuit to time of notice is unreasonable); *Thomas*, 334 So. 2d at 881, 885 (holding that insured acted unreasonably in waiting until lawsuit had been filed to notify insurer, where insured knew of the accident for six months prior being sued); *Tankersley*, 116 So. 2d at 580 (holding that the failure to report a claim for nine months after incident itself, and one month after filing of lawsuit, was unreasonable as a matter of law).

The real question here concerns the legitimacy of the *reasons* for the delay. As to that issue: "[i]f conflicting inferences can be drawn from the evidence, the question of reasonableness is submitted to the trier of fact. If the facts are undisputed, however, and the insured does not show justification for the protracted delay, the

-17-

court may find the delay unreasonable as a matter of law." *Baldwin County Home Builders Association*, 770 So. 2d at 75. What this means, in more straightforward terms, is that Alabama courts — while not enumerating the excuses that will always be *sufficient* to justify delay — have emphasized that certain excuses are inexorably *insufficient*, and need not be submitted to a jury. *See generally Sears Roebuck v. Southern Guaranty Insurance Company*, 675 So. 2d 449, 450-51 (Ala. Civ. App. 1996).

Although counsel for the Town focuses more on the language of the policy than on traditionally accepted excuses for failing to comply, an affidavit included with the Town's response raises one particular explanation that the Supreme Court of Alabama has repeatedly rejected. In the affidavit, current Town Clerk Destin N. Berryman — who attained his position nearly one year *after* the Notice of Claim was filed — explains that he has been unable to locate either Employers Mutual policy in the Town's records, and was personally unaware of their existence until Vines filed a lawsuit and he contacted the Town's insurance agent to inquire about possible coverage.[47] It is well-established, however, that the Town's lax record-keeping will

_____

[47] Doc. no. 15, Ex. 3 (Affidavit of Destin N. Barryman). Barryman goes on to state that he cannot find a copy of the Notice of Claim, either, but he does not appear to dispute the fact that the Notice of Claim was in fact filed. *Id.* Indeed, the Town has specifically admitted that contemporaneous Town Clerk received and signed that document. *Compare* doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶ 12; doc. no. 15, Defendants' Response to Plaintiff's Statement of Undisputed Facts, ¶ 12.

not ameliorate its breach of the notice provision. *See*, *e.g.*, *Dill v. Colonial Insurance Company of California*, 569 So. 2d 385, 387 (Ala. 1990) ("If Estes is arguing that his having no copy of his policy should exonerate him [from failing to give notice in accordance with the policy's provisions] as a matter of law, then we must reject this argument."); *Big Three Motors*, *Inc. v. Employers Insurance Company of Alabama*, 449 So.2d 1232, 1235-36 (Ala. 1984) (rejecting the theory that "[the *named* insured's] delay was reasonable because it had no knowledge of the existence of the policy until January 1982, and upon discovery thereof, *immediately* notified its insurance agency") (emphasis in original).

Of course, even if this oft-rejected justification would suffice, Barryman was not the Town Clerk at the time the Notice of Claim was filed, and the Town has not offered any evidence suggesting that the person responsible for handling claims *at that time* was unaware of the insurance policies. *Cf. Spring Lake*, 350 So. 2d at 401 (holding that the named insured's belief that the policy was not in effect at the time of the accident was an insufficient excuse for delay, where there was no evidence that efforts were made to verify that belief, nor any allegation that the policy was lost at the time the insured learned of the claim). Without even so much as an affidavit from the former Town Clerk who actually received the Notice of Claim, stating that he or she was unaware of the existence of insurance, there is no discernable factual dispute

for a jury to resolve.

Indeed, aside from this affidavit, much of the Town's defense is predicated on its own, tenuous interpretation of the policy's notice provisions. Its central argument is encapsulated in the following novel theory:

> Since the term "claim" is not defined by the CGL Policy . . . the document received by the Town on November 24, 2003 . . . is not a "claim" that would require the Insureds to notify [Employers Mutual] under the policies; or, in the alternative, it would allow the Insureds to determine when to notify Employers Mutual because there is no guidance in the policies as to what constitutes a "claim." [Employers Mutual] could have made it a specific requirement in the policies that the Town give them notice when the Town receives a document required in the Code of Alabama 11-47-23 [*sic* — should read Alabama Code § 11-47-*192*] but [Employers Mutual] did not do this.[48]

The court is somewhat hesitant to even consider these makeweight arguments. Nonetheless, they cannot stand unaddressed.

The fact of the matter is: "[w]hile ambiguities or uncertainties in an insurance policy should be resolved against the insurer, ambiguities are not to be inserted by strained or twisted reasoning." *Twin City Fire Insurance Company v. Alfa Mutual Insurance Company*, 817 So.2d 687, 692 (Ala. 2001). Moreover,

> [a]n undefined word or phrase in an insurance policy does not create an inherent ambiguity. To the contrary, where questions arise as to the meaning of an undefined word or phrase, the court should simply give the undefined word or phrase the same meaning that a person of

---

[48] Doc. no. 15, p. 7.

-20-

ordinary intelligence would give it.

*Id.*   Black's Law Dictionary defines "claim" variously as "[t]he assertion of an existing right; any right to payment or to an equitable remedy," and "[a] demand for money, property, or a legal remedy to which one asserts a right."   *Black's Law Dictionary* 264 (8th ed. 2004).   Webster's considers it "a demand for something due or believed to be due."   *Webster's New Collegiate Dictionary* 203 (1st ed. 1981).

Placed in context (the CGL Policy requires notice whenever "a claim is *made*" and distinguishes "claim" from "suit"[49]), it should be obvious that notice is necessary whenever a third-party "assert[s] . . . an existing right . . . to payment," lodges "[a] demand for money," or makes "a demand for something due."   *Black's* at 264; *Webster's* at 203.   Here, a third-party filed a document with the Town Clerk that was entitled "Notice of *Claim* Against the City of Leighton, Alabama," recited the factual basis for the claim, and *demanded payment* of damages in the sum of $500,000.   No reasonable person who was aware of the CGL Policy's notice provision could examine this document and believe that it did not constitute a "claim" requiring notice to Employers Mutual.

The case of *Scottsdale Insurance Company v. Town of Orange Beach*, 618 So. 2d 1323 (Ala. 1993), cited by the Town, does not undermine this conclusion.   That

---

[49] Doc. no. 14, Ex. 1, p. 11 (emphasis supplied).

case involved a so-called "claims-made" insurance policy that applied to all "claims" *first* asserted against the insured during the policy period, but did not define what constituted a "claim." *Id*. at 1324. Prior to the effective date of coverage, the insured received a letter from a third-party stating, "we are preparing to file suit for damages." *Id*. The letter also expressed "regret" over the decision to sue, speculated that the damages could be mitigated by prompt action on the part of the insured, and offered to "discuss th[e] matter" with the insured at any time. *Id*. When a lawsuit was eventually filed *inside* the policy period and the insured requested coverage, the insurance company contended that the letter represented the first statement of the claim and accordingly refused to indemnify the insured. *Id*. The insured disputed that the letter was a "claim," pointing out that the policy did not define that term. *Id*. The trial court submitted the issue to a jury, and the Supreme Court of Alabama refused to reverse that decision. *Id*. at 1324-25.

It is clear from a review of the *Scottsdale* court's rationale that the ambiguity there did not rest on a holding that the word "claim" is somehow inherently indeterminate. Rather, the court focused on the uncertain tone of the *letter*, which arguably did not manifest any concrete "'intention . . . to hold the insureds responsible'" — a state of mind that another provision of the policy appeared to list as indicative of a "claim." *See id*. at 1325 (quoting the insurance policy). The facts

-22-

here are simply not that close.  The Notice of Claim filed with the Town of Leighton unequivocally identifies itself as a "claim," states that Jamie Sims is "responsible for [the] claimant's injuries," and "*demands* damages of $500,000."[50]  Furthermore, unlike in *Scottsdale*, the CGL Policy does not contain any language that indicates some intent to alter the commonsense definition of the term "claim."  In light of this, the court holds that the document in question triggered the Town's duty to provide notice to Employers Mutual.  Since it did not do so within a reasonable time, Employers Mutual is relieved of its correlative obligation to provide a defense to the Town, regardless of any alleged lack of prejudice.  *See Big Three Motors*, 449 So.2d at 1235.  Accordingly, Employers Mutual's motion for summary judgment against the Town will be granted to the extent that it relates to the defense provisions of the CGL Policy.[51]

**B.    Jamie Sims**

     **1.    Failure to provide notice of claim**

In its original brief, Employers Mutual argued that Jamie Sims also breached the notice provisions of the CGL Policy by failing to forward Vines' Notice of Claim

---

[50] Doc. no. 14, Ex. 4 (emphasis supplied).

[51] Given this ruling, the other arguments for why Employers Mutual should not be obligated to provide coverage to the Town under the CGL Policy need not be discussed.

promptly after it was filed.[52]  As observed above, however, Sims responded to the motion for summary judgment with an affidavit stating that he resigned from his position as a police officer with the Town of Leighton in July 2003, approximately four months before Vines filed her Notice of Claim with the Town Clerk.[53]  Sims alleges that, due to his disassociation with the Town, he was not informed of Vines' claim, and in fact did not learn of her contentions until he was served with her state court complaint in the summer of 2005.[54]  When Employers Mutual filed a reply brief, it rehashed every argument previously offered in support of noncoverage *except* the theory that Sims breached the notice provision of the CGL Policy.[55]  As a result, the court is not confident that Employers Mutual continues to assert failure to give notice as a legitimate basis for refusing to provide Sims with coverage.

Even assuming that Employers Mutual remains attached to this theory, though, the court is not persuaded that summary judgment is appropriate on this ground. Sims' explanation for failure to give notice, if true, appears eminently reasonable:  he alleges he simply did not know of Vines' allegations or her demand for damages and, thus, could not pass that information along to Employers Mutual.  Moreover,

---

[52] Doc. no. 13, pp. 8-14.

[53] Doc. no. 15, Ex. 2, p. 1.

[54] *Id*. at p. 2.

[55] *See generally* doc. no. 18.

Employers Mutual has not tendered any evidence to contradict Sims' claim. Thus, barring some other basis for summary judgment, the issue of Employers Mutual's duty to defend Sims under the CGL Policy would need to be submitted to a jury.

### 2.   "Law Enforcement Activities" exclusion

Employers Mutual is more clear in its adherence to another argument: *i.e.*, that the "Law Enforcement Activities" endorsement included as a rider to the CGL Policy precludes coverage of Vines' claims against Sims.[56]   Under Alabama law, "insurers have the [qualified] right to limit their liability by writing policies with narrow coverage" or by including exclusions.   *Shrader v. Employers Mutual Casualty Company*, 907 So. 2d 1026, 1034 (Ala. 2005) (internal quotations and citations omitted).   Where an issue arises as to the applicability of any exclusion, however, the insurer has the burden to prove that it renders a given claim outside the scope of the policy's coverage.   *E.g.*, *Twin City Fire Insurance Company v. Alfa Mutual Insurance Company*, 817 So.2d 687, 697 (Ala. 2001) ("Twin City has the burden of proof in asserting that a claim is excluded under its policy of insurance.").   In determining whether Employers Mutual has carried its burden, the court must examine the coverage exclusions in conjunction with the facts of the underlying case.   *See Acceptance Insurance Company v. Brown*, 832 So. 2d 1, 14 (Ala. 2001) ("Whether

---

[56] *See* doc. no. 13, p. 19.

an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint.").

The endorsement at issue here modifies the CGL Policy to the following extent:

1.    Paragraph 2.  Exclusions.  (Section I - Coverage A - Bodily Injury and Property Damage Liability)

This insurance does not apply to "bodily injury" arising out of *any act or omission resulting from law enforcement activities* of your police department or any of your law enforcement agencies, including their agents or "employees"

a.    attempting to make an arrest, or
b.    holding someone under arrest.

2.    Paragraph 2.  Exclusions.  (Section I - Coverage B - Personal and Advertising Injury Liability)

This insurance does not apply to "personal and advertising injury" arising out of *any act or omission resulting from law enforcement activities* of your police department or any of your law enforcement agencies, including their agents or "employees."[57]

Thus, the endorsement makes alterations to both Coverage A ("bodily injury" and "property damage") and Coverage B ("personal and advertising injury") under the CGL Policy.  The court will address the effect of the "Law Enforcement Activities"

---

[57] Doc. no. 14, Ex. 1, Law Enforcement Activities Endorsement (emphasis supplied).

endorsement on these two coverage parts in turn.

### a.    Applying the "Law Enforcement Activities" exclusion   to Coverage A

By its own terms, the "Law Enforcement Activities" endorsement does not apply to "property damage."[58]  On the other hand, coverage of "bodily injury" is excluded insofar as the injury is attributable to any "act or omission" of an employee of the Town's police department that occurs during an arrest.[59]  (It is notable, incidentally, that the policy drafters did not narrow the term "arrest" through the use of the modifier "lawful" or any similar word, so the existence *vel non* of probable cause is irrelevant).  Obviously, Sims was an employee of the Town's police department at the time of Vines' arrest,[60] and the complaint in the state court action so alleges.[61]  The complaint also recites the circumstances leading up to Vines' allegations of "bodily injury":

> At said time and place the Leighton police officer, Defendant, Jamie Sims, approached the Plaintiff's vehicle. . . .  Defendant Sims forcibly removed the Plaintiff from her vehicle causing the Plaintiff personal injury; Defendant Sims handcuffed the Plaintiff and Defendant Sims arrested the Plaintiff, charging her with resisting arrest and

---

[58] *Id*.  Hence, the allegations in the complaint of "property damage" will be dealt with separately below.

[59] *Id*.

[60] Doc. no. 15, Ex. 2, p. 1 ("I was on duty as a Leighton police officer when I arrested Tammy Vines.").

[61] Doc. no. 14, Ex. 3, ¶ 5.

obstructing governmental operations.

. . .

As a result of the actions of Defendant Sims, the Plaintiff was bruised and contused about her left arm and back. She suffered injury[:] a radial head fracture to her left elbow. The Plaintiff was required to seek medical care for said injuries and continues to suffer pain from said injuries.[62]

Based upon these allegations, Vines' complaint includes claims for "bodily injury" under constitutional theories of cruel and unusual punishment and excessive force,[63] as well as state law theories of negligence[64] and assault / battery.[65]

The court sees no way around the conclusion that Vines' "bodily injur[ies]" stemming from these allegations against Sims are excluded from coverage by the "Law Enforcement Activities" exception. Indeed, Sims does not even attempt to argue otherwise in his brief, leaving the issue totally unaddressed.[66] Examining the situation unilaterally, the court notes that although the phrase "law enforcement activities" is not defined (either in the CGL Policy itself or in the rider), the exclusion specifically lists "attempting to make an arrest" as a noncovered "law enforcement activity."[67] The state court complaint *explicitly* states that Vines suffered injury as a

---

[62] *Id*. at ¶¶ 7, 14.

[63] *Id*. at ¶ 16 (Count I).

[64] *Id*. at ¶¶ 21-22 (Count II).

[65] *Id*. at ¶¶ 26, 28 (Count IV).

[66] *See* doc. no. 15, pp. 15-16 (discussing only *the Town's* right to coverage in spite of the Law Enforcement Activities rider).

[67] *Id*. at Ex. 1, Law Enforcement Activities Endorsement.

result of Sims' actions in extricating her from her vehicle and placing her under arrest.  Vines does not allege that she suffered "bodily injury" at any point *other than* during the arrest itself.  Therefore, Employers Mutual has no duty to defend Sims against the counts of the state court complaint to the extent that they seek redress for "bodily injury."

### b.  Applying the "Law Enforcement Activities" exclusion to Coverage B

The CGL Policy at issue also provides coverage for "personal and advertising injury" — which is defined as including injury arising out of "[f]alse arrest, detention or imprisonment" and "[m]alicious prosecution."[68]  These are precisely the injuries enumerated in the remaining counts of Vines' state court complaint: Count III alleges "false arrest / imprisonment";[69] Count I alleges, *inter alia*, unconstitutional deprivation of liberty due to an arrest without probable cause;[70] and Count V alleges

---

[68] Doc. no. 14, Ex. 2, p. 14.

[69] *Id.* at Ex. 3, ¶ 23.

[70] *Id.* at ¶ 16.  The court acknowledges that the CGL Policy does not expressly include deprivation of a citizen's constitutionally protected liberty interest under the definition of "personal and advertising injury."  *Id.* at Ex. 1, p. 14.  Still, injury flowing from the offense of "false arrest" is covered by that definition.  *Id.*  In addition to being actionable under state law, a false arrest by a police officer gives rise to a constitutional cause of action for deprivation of liberty under 42 U.S.C. § 1983.  *See, e.g., Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).  The facts giving rise to the claims, and the interest to be vindicated thereby, are essentially identical.  Thus, the court considers the resolution of the duty to defend Vines' false arrest claim dispositive of the same issue as it relates to her § 1983 claim for deprivation of liberty.

malicious prosecution.[71]   Thus, but for the presence of the "Law Enforcement Activities" endorsement, it appears that Employers Mutual would have a duty to defend Sims against the complaint.

The fact of the matter, however, is that the endorsement excludes coverage of "personal injur[ies]" on an apparently *broader* scale than "bodily injur[ies]."  That is, the CGL Policy does not apply to any such injuries "arising out of any act or omission *resulting from law enforcement activities*" of the Town's police department or employees, regardless of whether the activity in question is an arrest or some other enforcement function.[72]   The court has little doubt that arresting, detaining, and prosecuting suspected criminals are all "law enforcement activities."  Black's Law Dictionary, for instance, defines "law enforcement" as "[t]he *detection* and *punishment* of violations of the law." *Black's* at 901 (emphasis supplied).  Moreover, "[m]any other courts have considered variations of the phrase 'arising out of law enforcement functions and activities,' and have nearly unanimously construed it broadly to include a variety of claims." *Clarendon National Insurance v. City of York*, 290 F. Supp. 2d 500, 507 (M.D. Pa. 2003) (collecting cases).

Of particular interest is an Alabama Supreme Court case that, while not

---

[71] *Id*. at ¶ 29.

[72] *Id*. at Law Enforcement Activities Endorsement (emphasis supplied).

*directly* addressing such an exclusion, impliedly holds that the term "law enforcement activities" embraces the claims asserted by Vines in her state court complaint. In *Titan Indemnity Company v. Riley*, 641 So. 2d 766 (Ala. 1994) (*Titan I*), the issue was whether the conduct of several Montgomery, Alabama police officers fell within the scope of a "Law Enforcement Officers' Liability Coverage" insurance policy issued to the City of Montgomery by Titan Indemnity Company. *Id*. at 767-68. Unlike the present case, the policy did not include an exclusion for law enforcement activities; on the other hand, its applicability was limited to injuries "caused by an occurrence *resulting from law enforcement activities*." *Id*. at 768 (some emphasis deleted). The officers involved in the case faced federal charges alleging that they had:

> fabricated 'information' from . . . fictitious informants, . . . conducted an unconstitutional search of [the victim's] person and his automobile and filed criminal complaints against him without probable cause. They also 'planted' false evidence in [the victim's] vehicle and supported [his] criminal prosecution with false testimony.

*Id*. at 767. Based on these allegations, the victim sued the officers for malicious prosecution and various other violations of his civil rights. *Id*. Titan argued that the alleged misconduct did *not* occur in the course of "law enforcement activities," and also that the officers' actions were excluded under an "intentional acts" clause of the policy. *Id*. at 768. The court held that the "intentional acts" clause was ambiguous, and therefore construed the policy in favor of the insureds, ordering coverage. *Id*.

In so doing, the court did not expressly articulate whether the allegations touched and concerned "law enforcement activities," but the court's conclusion in the case — coverage under the policy — is only logically coherent if that question is answered affirmatively.  Indeed, following remand, the Alabama Supreme Court clarified its holding on this point:

> [In *Titan I*] we concluded that "the acts of corruption that caused Riley's unlawful incarceration were . . . 'occurrences' that resulted from law enforcement activities" within the meaning of the terms used in the policy. 641 So. 2d at 768.  Indeed, the only legal basis for the holding that Titan was obligated to *defend* the officers was that the *conduct committed* by the officers was *conduct covered* under the policy.

*Titan Indemnity Company v. Riley*, 679 So.2d 701, 705 (Ala. 1996) (*Titan II*) (emphasis in original).

In view of the *Titan* cases, the court easily concludes that Sims' alleged malicious prosecution of Vines  was a "law enforcement activity" under the terms of the "Law Enforcement Activities" rider to the CGL Policy.  Accordingly, Employers Mutual is not obligated to provide a defense for any injury allegedly resulting therefrom.  There is nothing in the *Titan* cases, nor elsewhere in the Alabama reporters, stating whether an arrest constitutes "law enforcement activity," but common sense fills in the blanks.  Sims' allegedly unjustified arrest of Vines was patently a "law enforcement activity," meaning that Employers Mutual need not

defend Sims against the counts of Vines' complaint alleging false arrest / imprisonment and unconstitutional deprivation of liberty. *Cf. Western World Insurance Company v. Reliance Insurance Company*, 892 F. Supp. 659, 665 (M.D. Pa. 1995) (applying Pennsylvania law) ("Unlike incarceration following an adjudication or plea of guilt, temporary detention of an arrestee pending arraignment or release from custody is a law enforcement activity when performed by a police officer.").

### 3.   "Intentional Acts" exclusion

To summarize, the court's conclusions thus far mean that Employers Mutual is not obligated to provide Sims a defense for any of the allegations of either "bodily injury" or "personal injury" in Vines' complaint.  As mentioned, however, the CGL Policy also covers one additional sort of risk:  "property damage."  Although not articulated with stunning clarity, Vines' complaint can be read to assert causes of action for damage to her video camera under both § 1983 and state negligence law.[73] It is Employers Mutual's position that the CGL Policy does not cover this damage because, assuming that it happened, it was not "'property damage' caused by an 'occurrence.'"[74]   That is, Employers Mutual states that any damage to the video

---

[73] Doc. no. 14, Ex. 3, ¶¶ 10, 16, 19, 21.

[74] *Id*. at Ex. 1, p. 1.

camera was not the result of "an accident," as required by the CGL Policy.[75]    I n

weighing this contention, the court must perform a dual analysis.

> First, [the court] must determine whether the facts alleged in [Vines']
> complaint state an "occurrence" within the meaning of the policy.
> Secondly, and presupposing a negative answer to the first inquiry, [the
> court] must determine whether the "facts which may be proved by
> admissible evidence" state an "occurrence."

*Merchants & Farmers Bank*, 928 So. 2d at 1011 (quoting *Pacific Indemnity Company*

*v. Run-A-Ford Company*, 161 So. 2d 789, 795 (Ala. 1964)).

In her complaint, Vines states that "Sims *forcibly seized* a video camera . . .

from the Plaintiff and *threw* it to the ground[,] thereby causing damage to the

camera."[76] These averments simply do not allege an "accident" (*i.e.*, an "occurrence")

within the meaning of the CGL Policy.  Although "accident" is not defined in the

insurance agreement, "it is a commonly used word in the legal profession." *Id*. at

1011.  The Alabama Supreme Court has "previously held that the term 'accident' does

not exclude human fault called negligence." *U.S. Fidelity & Guaranty Company v.*

*Armstrong*, 479 So. 2d 1164, 1167 (Ala. 1985).  On the other hand, by definition, an

"accident" is "[a]n *unintended* and *unforeseen* injurious occurrence." *Black's Law*

*Dictionary* at 15 (emphasis supplied).  *See also Merchants & Farmers Bank*, 928 So.

---

[75] *Id*. at p. 14 (defining "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions").

[76] *Id*. at Ex. 3, ¶ 7 (emphasis supplied).

2d at 1011 (quoting Black's Law with approval).  If, as alleged, Sims "forcibly seized]" a video camera and "threw it to the ground," he did not act negligently, but intentionally.[77]  One does not "forcibly seize" another's chattel without an intent to do so; nor does one *throw* something to the ground unintentionally.

Since the descriptive facts of the complaint clearly do not state an "occurrence" within the meaning of the CGL Policy, the court will inventory the evidence on file. *Merchants & Farmers Bank*, 928 So. 2d at 1011.  This is not a difficult task, for Sims has not offered even an ounce of proof relevant to the demise of the video camera. Sims did execute an affidavit, but it focuses exclusively on his reasons for failing to give notice of Vines' possible claim, and on the allegations of *bodily* harm to Vines.[78] Sims states that "[i]f [Vines] was injured, I either did not cause the injury or it was caused accidentally," but he does not explain any of the facts surrounding her claim that he damaged her video camera.[79]

Accordingly, the court holds that, based on the facts enunciated in the state court complaint, the "property damage" in question was not caused by an "occurrence," and Employers Mutual does not have a duty to defend Sims against any

---

[77] Certain counts of Vines' complaint are cast in terms of negligence, but "it is the facts, not the legal phraseology, that determine whether an insurer has a duty to defend its insured in the action." *Merchants & Farmers Bank*, 928 So. 2d at 1012.

[78] Doc. no. 15, Ex. 2.

[79] *Id.* at p. 1.

claim arising out of the alleged damage to Vines' video camera.  Further, having concluded that all of Vines' claims against Sims are barred by exclusions or otherwise not covered by the CGL Policy, Employers Mutual's motion for summary judgment against Sims will be granted to the extent that it relates to the defense provisions of that policy.

## PART FIVE

*Duty to Defend — Linebacker Policy*

### A.     The Town of Leighton

### 1.     Failure to provide notice and forward papers

The court has already provided a lengthy analysis on the issue of the Town's failure to comply with the notice provisions of the CGL Policy.  Much of that analysis is the same with respect to the Linebacker Policy, and therefore will not be reiterated here.  Nevertheless, there are subtle distinctions in the two notice provisions that must be examined before announcing a decision.  Unlike the CGL Policy, the Linebacker Policy's notice provision does not require notice of "claims" *per se*.  Rather, it is the duty of the insureds to give "prompt written notice . . . of any 'wrongful act' *that may involve* this policy."[80]   It also requires the insureds to "immediately furnish [Employers Mutual] with a copy [of any 'suit' papers] as well as copies of any *other*

---

[80] Doc. no. 14, Ex. 2, p. 5 (emphasis supplied).

*papers pertinent to* the 'wrongful act.'"[81]

It is undisputed that the Town neither provided notice of the alleged "wrongful act," nor forwarded Vines' Notice of Claim to Employers Mutual. Indeed, Employers Mutual never learned of the existence of the claim until several weeks after Vines filed a lawsuit in state court.[82] The court has already concluded that waiting until after the lawsuit was filed to pass this information along to Employers Mutual was unreasonable, absent some extenuating circumstance or other sufficient justification. Further, many of the Town's "excuses" have been rejected. However, the Town offers a few more arguments in this regard that pertain specifically to the Linebacker Policy. One theory is that

> nothing in the notice provision [of the Linebacker Policy] requires the [i]nsureds to give notice to Employers Mutual when they receive a "claim", [*sic*] nor does the term "claim" appear in the definition of "wrongful act." Therefore, the document entitled "Notice of Claim Against the City of Leighton, Alabama" presented to the Town by Ms. Vines on November 24, 2003 . . . would not require the Town or Jamie Sims to give notice to Employers Mutual under the Linebacker Policy. The Town and Jamie Sims did give timely notice to Employers Mutual after they received "suit" papers as required by the Linebacker Policy.[83]

This entire argument is based on the explicit assumption that the Linebacker Policy only requires the insureds to provide Employers Mutual with copies of "suit"

---

[81] *Id.*

[82] Doc. no. 13, Plaintiff's Statement of Undisputed Facts, ¶ 13.

[83] Doc. no. 15, p. 10.

papers. This interpretation of the Linebacker Policy is simply not within reason. The notice provision clearly states that, in addition to "suit" papers, "you agree to immediately furnish us with . . . copies of *any other papers pertinent to the* "*wrongful act.*"[84]  Obviously, a document entitled "Notice of Claim Against the City of Leighton, Alabama," which apprises the Town of certain allegations of constitutional infractions by Sims, and demands payment of $500,000 as damages, is a paper "pertinent to the 'wrongful act.'"[85]  No reasonable insured could conclude otherwise.

Since the Town has offered no other justification for its failure to comply with this unambiguous condition precedent, there are no factual disputes, and Employers Mutual is due judgment as a matter on law on its request for a decree stating that it has no duty to defend the Town. *See*, *e.g.*, *Tankersley*, 116 So. 2d at 582.

**B.   Jamie Sims**

**1.   Failure to provide notice and forward papers**

As observed in Part Four of this opinion, some of Sims' excuses for failing to comply with the notice conditions of the insurance policies are more reasonable than those offered by the Town.  Employers Mutual would be hard-pressed to dispute that Sims could not have complied with the Linebacker Policy requirement that the

---

[84] Doc. no. 14, Ex. 2, p. 5.

[85] *Id*.

insured forward all pertinent papers in light of the fact that he never saw the Notice of Claim filed with the Town several months after his resignation. *Cf. Pan American*, 266 So. 2d at 772 (failure to report was reasonable as a matter of law where insured was totally unaware of any claim under particular policy until suit was filed). Somewhat closer is the question of whether Sims acted prudently in failing to report the allegedly "wrongful act" following the incident with Vines. Vines' complaint paints a disturbing portrait of an angry lawman forcefully arresting and charging an innocent citizen who was peacefully exercising her First Amendment rights. In other words, if Vines' version of events is to be believed, it would be difficult to hold that Sims was justified in failing to disclose the possibility of a "wrongful act" to Employers Mutual. As it happens, however, Sims continues to assert that he had probable cause to arrest Vines, and assures the court that "[a]s far as I know she was not injured during the arrest."[86]

Generally, a jury issue is presented where late notice is arguably attributable to the insured's reasonable failure to perceive a genuine possibility of a lawsuit involving the liability policy. In *McDonald v. Royal Globe Insurance Company*, 413 So. 2d 1046 (Ala. 1982), for example, the court held that the insured's excuse for failing to give timely notice of an "occurrence" merited submission to the jury. *Id.*

---

[86] Doc. no. 15, Ex. 2, p. 1.

at 1048.  The insured was the owner of a nightclub who had been sued by a patron after the patron was injured in a fight with one of the nightclub's managers.  *Id*. at 1047.  The insured was warned verbally that suit might be filed, but he did not tell his insurer.  *Id*.  In defending his inaction, the insured contended, *inter alia*, that due to "the nature of his business, he is threatened with suit frequently but is seldom sued." *Id*. at 1049.  The Supreme Court of Alabama held that debating the reasonableness of this excuse was the exclusive province of the jury.  *Id*.

Preliminarily, it should be noted that the insured in *McDonald* actually appears to have had less ground to stand upon than Sims — *i.e.*, he was verbally warned that he might be sued but still failed to act.  *McDonald* is helpful for Sims in other respects as well.  At the time of the incident in question, Sims served as a police officer.  As is the case with nightclub owners and bouncers, the nature of police work often requires officers to become involved in volatile situations that necessitate physical contact with citizens.  Indeed, police officers are in many cases duty-bound to use force to subdue citizens, and to file criminal charges against them.  For that reason, police officers are commonly the target of lawsuits alleging various abuses of power.  It would seem inadvisable, then, to hold as a matter of law that they have a duty to report every encounter with an unhappy arrestee to their insurance carriers. Of course, certain cases may present such egregious circumstances that no reasonable

officer would fail to provide such notice; but, based on *the affidavits* in this case, a jury could conclude that Sims honestly thought his conduct was within reason and, consequently, did not perceive any threat of legal action.[87]

Therefore, the court will deny Employers Mutual's motion for summary judgment to the extent that it relies upon the theory that Sims' failure to give notice was unreasonable as a matter of law.  Sims has offered a potentially viable excuse for not providing notice of the actual claim (*i.e.*, he allegedly was not aware of it), and his affidavit suffices to bring the question of whether he acted reasonably in not reporting the incident itself within the province of a jury.

### 2.    "Bodily injury" and "property damage"

One of Employers Mutual's alternative theories is that, regardless of the court's decision on notice or other possible bases for coverage exclusion, the Linebacker Policy itself is drafted so as to not apply to "bodily injury" and "property damage."[88] This is only partially true.  Coverage of "property damage" is very plainly excluded in the body of the policy, and no endorsements serve to alter that exclusion.[89]  Sims' only arguments to the contrary are not persuasive.  Therefore, Employers Mutual's

---

[87] It may well be that deposition transcripts could have negated the issue of fact on this point, but neither party provided the court with any such evidence.

[88] Doc. no. 13, p. 23.

[89] Doc. no. 14, Ex. 2, p. 4.

motion for summary judgment is due to be granted to the extent it seeks a declaration that it has no duty to defend Sims for "property damage" under the Linebacker Policy.

On the other hand, Employers Mutual is mistaken in contending that the Linebacker Policy excludes coverage of all "bodily injury."  As outlined in Part Two of this opinion, the "bodily injury" exclusion in the Linebacker Policy is drafted very precisely.  There is no coverage of "[b]odily injury,' *except for* '*bodily injury included in the definition of Personal Injury*.'"[90] Turning to the definition of "personal injury," it becomes clear that two discrete types of "bodily injury" are listed as varieties thereof — "'[b]odily injury' arising while the insured: . . . is attempting to make an arrest; [or] . . . is holding someone under arrest."[91]  While "personal injury" is actually the subject of *yet another* exclusion, the Linebacker Policy purchased by the Town was endorsed with a "Personal Injury" rider that *reinstates* coverage for such injuries.  The sole allegations of Vines' complaint that touch on "bodily injury" arise out of her arrest.  Therefore, the court finds that the "bodily injury" exclusion in the Linebacker Policy does not preclude coverage of Vines' allegations.

### 3.    "Intentional Illegal Acts" exclusion

---

[90] *Id*. (emphasis supplied).

[91] *Id*.

Employers Mutual's final proposed basis for the entry of summary judgment in its favor on the Linebacker Policy is that the actions alleged in Vines' complaint, "if true, are illegal and were intentionally done."[92]  According to Employers Mutual, this brings the conduct outside the scope of coverage due to the policy's "intentional illegal acts" exclusion.  That exclusion states that:  "[t]his policy does not apply to . . . [i]ntentional illegal acts where: . . . [i]llegality was known prior to commitment of the act."[93]

It has already been noted that "the insurer bears the burden of proving the applicability of any policy exclusion."  *Auto-Owners Insurance Company v. Toole*, 947 F. Supp. 1557, 1561 (M.D. Ala. 1996).  Here, however, Employers Mutual has done little more than raise the issue, providing almost no analysis of the clause, and citing not a single case to buttress its contentions.  The court is not convinced that this exclusion is self-explanatory, either.

The principal problem is that the Linebacker Policy does not define the term "illegal."  While not every term in a contract of insurance demands definition, it need hardly be pointed out that "[t]he phrase 'illegal act' is susceptible of two reasonable meanings."  *Safeco Insurance Company of America v. Robert S.*, 28 P.3d 889, 893

---

[92] Doc. no. 13, p. 23.

[93] Doc. no. 14, Ex. 2, p. 4.

-43-

(Cal. 2001).  That is, it could refer to criminal acts, or to tortious acts.  Legal dictionaries simply describe "illegal" as meaning "[f]orbidden by law; unlawful." *Black's Law Dictionary* at 763.  The court has not been able to locate any Alabama cases expounding upon this sort of exclusion, but in the few cases from other jurisdictions that examine exclusions for "illegal acts" (or similar phrasing), a common conclusion is that, "[b]roadly construed, a violation of *any* law, whether civil or criminal, is an illegal act." *Safeco*, 28 P.3d at 894 (emphasis in original).  *See also Okehi v. St. Paul Fire & Marine Insurance Company*, 289 S.E.2d 810, 813 (Ga. Ct. App. 1982) (noting that a policy exclusion for "any personal injury that results when you knowingly break any law" could be construed to preclude coverage of claims for the tort of false imprisonment, and apparently refusing to apply the exclusion to avoid that anomalous result).

In *Safeco*, the California Supreme Court faced an exclusion that was substantially similar to the one at issue here:  the policy disclaimed coverage of injuries "arising out of any *illegal act* committed by or at the direction of an insured." *Safeco*, 28 P.3d at 893 (emphasis in original).  The court considered and rejected several limiting definitions of "illegal act" before finally resolving to disregard the exclusion entirely.  The possibility of treating the term as if it were synonymous with "criminal act" was eliminated because "Safeco chose not to have a criminal act

-44-

exclusion, instead opting for an illegal act exclusion, [and a court] cannot read into the policy what Safeco has omitted." *Id*. This reasoning is perfectly consistent with the principle of Alabama law "that an ambiguous insurance policy is to be construed liberally in favor of the insured and strictly against the insurer." *Merchants & Farmers Bank*, 928 So. 2d at 1011.

Another possible resolution — defining the term "illegal act" as a "violation of *any* law, whether civil or criminal" — was refused because "a violation of 'any law' would include the law governing negligence, which holds individuals responsible for the failure to exercise ordinary care resulting in injury to another." *Safeco*, 28 P.3d at 894 (emphasis in original). The court noted:

> Safeco's homeowners policy promised coverage for liability resulting from the insured's negligent acts. That promise would be rendered illusory if, as discussed above, we were to construe the phrase "illegal act," as contained in the policy's exclusionary clause, to mean violation of any law, whether criminal or civil.

*Id*. Like in *Safeco*, the Linebacker Policy at issue here plainly purports to cover "neglect or breach of duty by an 'insured.'"[94] The Linebacker Policy also assures coverage of injury arising out of false arrest, detention or imprisonment, malicious prosecution, and violation of a third-party's constitutional rights — all of which are

---

[94] Doc. no. 14, Ex. 2, p. 4 (defining "wrongful act").

"illegal" acts.[95]  Therefore, the promises of coverage in the Linebacker Policy "would be rendered illusory if, as discussed above, [the court] were to construe the phrase 'illegal act,' as contained in the policy's exclusionary clause, to mean violation of any law, whether criminal or civil."  *Id*.  The *Safeco* court's resolution of this dilemma was simply to ignore the clause altogether.  "In short, because the illegal act exclusion cannot reasonably be given meaning under established rules of construction of a contract, it must be rejected as invalid."  *Id.* at 895.

Although no local cases are exactly on point, there is ample reason to conclude that the Supreme Court of Alabama would reach this same result.  One example is the case of *Titan Indemnity Company v. Riley*, 641 So. 2d 766 (Ala. 1994), discussed above.  There the court dealt with an "intentional acts" exclusion, but the reasoning is equally sound in the present context:

> The language of the policy does preclude coverage for intentional acts, but it also specifically provides coverage for acts of malicious prosecution, assault and battery, wrongful entry, piracy, and other offenses that require proof of intent.  Further, the policy specifically provides coverage for claims brought under the Federal Civil Rights Act.  The conflict between these provisions creates an *inherent ambiguity within the policy*, and it is well settled in this state that when there is any doubt as to whether insurance coverage exists under a policy, the policy must be construed for the benefit of the insured.  Because the policy is ambiguous on its face, we construe it against Titan and conclude that Titan must defend the defendants on the claims

---

[95] *Id*. at p. 3.

against them.

*Id*. at 768 (emphasis supplied) (internal citation omitted).[96]

In light of *Titan* and the other extra-jurisdictional cases discussed, the court holds that the "Intentional Illegal Acts" exclusion in the Linebacker Policy must be construed in favor of Sims.  Essentially, this means that the term "intentional illegal acts" within that policy will be interpreted such that it *does not* preclude coverage of claims against Sims for false arrest / imprisonment, malicious prosecution, or civil rights offenses.  This is true notwithstanding the fact that all of these tortious and/or criminal acts are "illegal."  (Of course, the court's ruling does not translate to a decision that Employers Mutual will inevitably be bound to defend Sims; the jury will still have an opportunity to consider whether Sims violated the Linebacker Policy's

---

[96] In the same vein is *Lincoln National Health & Casualty Insurance Company v. Brown*, 782 F. Supp. 110 (M.D. Ga. 1992):

> The policy defines "personal injury" to mean not only "bodily injury" but also "false arrest," "malicious prosecution," and "assault and battery."  When this definition is read with the provision that only unintentional and unexpected "personal injury" is covered, then the policy only applies to unintentional false arrest, unintentional malicious prosecution, and unintentional assault and battery.  *This is complete nonsense*.  Thus, while under one provision, the policy claims that it *covers* claims for intentional acts such as malicious prosecution, false arrest, and assault and battery, on the other hand, the policy really covers *no* such claims. . . .  Thus, the court disregards the policy's provision which limits coverage to unintentional or unexpected injuries or those caused only by reasonable force and finds that Lincoln's LEOCL Policy provides coverage[.]

*Id*. at 112-13 (some emphasis supplied).

notice provisions.)

## PART SIX

*Duty to Indemnify — Both Policies*

The court has reserved ruling on the motion for summary judgment as it relates to the duty to indemnify because special ripeness questions must be addressed. *See generally Allstate Indemnity Company v. Lewis*, 985 F. Supp. 1341, 1349 (M.D. Ala. 1997). Unlike the duty to defend, an issue that is determined primarily upon the basis of factual allegations contained within the underlying complaint, "the duty to indemnify must be determined on the actual facts as established at trial." *Guaranty National Insurance Company v. Azrock Industries*, *Inc.*, 211 F.3d 239, 252 (5th Cir. 2000). *See also Merchants & Farmers Bank*, 928 So. 2d at 1013 ("Whether there is a duty to indemnify under the policy will depend on the facts adduced at the trial of the action between Barnett and Merchants[.]").

Therefore, faced with a declaratory judgment petition at a time when the underlying action has not yet proceeded to judgment, many courts either hold outright that the issue of the duty to indemnify is not ripe, or exercise their discretion under the Declaratory Judgment Act to decline issuance of an opinion. *See*, *e.g.*, *American Fidelity & Casualty Company v. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Company*, 280 F.2d 453, 461 (5th Cir. 1960) (affirming the

dismissal of declaratory judgment action to the extent it involved the question of whether the duty to indemnify was triggered since no judgment had been rendered in the underlying state court action);[97] *Employers Mutual Casualty Company v. All Seasons Window & Door Manufacturing, Inc.*, 387 F. Supp. 2d 1205, 1211-12 (S.D. Ala. 2005) (surveying Eleventh Circuit precedent and concluding that "[i]t is simply inappropriate to exercise jurisdiction over an action seeking a declaration of the [insurer's] indemnity obligations absent a determination of the insureds' liability to the [underlying claimants]."); *Toole*, 947 F. Supp. at 1566 ("Here, Toole could prevail in the underlying lawsuit.  With this result, the issue of whether Auto-Owners must indemnify Toole would be moot, and the court would never have to reach the issue."). *See also Premcor USA, Inc. v. American Home Assurance Company*, 400 F.3d 523, 530 (7th Cir. 2005) (holding that the district court "acted precipitously" in rendering a decision on the duty to indemnify while the judgment in the underlying case was still on appeal); *Cincinnati Insurance Companies v. Pestco, Inc.*, 374 F. Supp. 2d 451, 464 (W.D. Pa. 2004) ("As a general rule, a court entertaining a declaratory judgment action in an insurance coverage case should refrain from determining the insurer's duty to indemnify until the insured is found liable for damages in the underlying

---

[97] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

action.").

One of the rationales for abstaining on questions of indemnity is that "the plaintiff in the underlying suit may still change the theory of liability and assert a claim that is covered by the policy at issue." *State Auto Property & Casualty Insurance Company v. Calhoun*, No. 2-05-CF-122-F, 2005 WL 2406055, at * 6 (M.D. Ala. Sept. 29, 2005). It is for this reason that this court will not venture an opinion as to the duty to indemnify Sims under the CGL Policy. While the current allegations fall within the bar established by the "Law Enforcement Activities" exception, Vines could amend her complaint, or the facts elicited at trial could paint a different picture. Of course, the facts may not change. But "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass." *Threshermen*, 280 F.2d at 461. This portion of the declaratory judgment petition will be dismissed without prejudice to Employers Mutual's right to refile it at such time, if there is such a time, that Vines obtains a judgment against Sims.

On the other hand, the court's ruling that the Town of Leighton breached the notice provisions of both policies *cannot* be rendered moot by factual developments in state court. That determination was not predicated upon an analysis of the facts alleged in Vines' complaint. The court simply consulted case law and evaluated the

"excuses" offered by the Town for reasonableness.  In this situation, the reasons that negate the duty to defend also serve to negate any possibility of a duty to indemnify and, thus, there is little need to withhold ruling on the indemnification issue.  *Cf. United National Insurance Company v. Dunbar & Sullivan Dredging Company*, 953 F.2d 334, 338 (7th Cir. 1992) (holding that "where there is no duty to defend there cannot arise a duty to indemnify.  Conversely, where there is a duty to defend, the duty to indemnify must await resolution of the underlying suits.") (internal citations omitted).  All that is left is to say it:  the court's holding that the Town breached the notice conditions under the CGL and Linebacker Policies functions to excuse Employers Mutual from *any* duties thereunder; summary judgment on the duty to indemnify the Town will be granted.

 That leaves only the question of the duty to indemnify Sims under the Linebacker Policy.  The court has held that the Linebacker Policy excludes coverage for "property damage," regardless of the underlying facts.  Therefore, the motion for summary judgment on the duty to indemnify for "property damage" under that policy should be granted.  The issue of coverage for "personal injury" under the Linebacker Policy has not yet been resolved, however, due to issues of fact surrounding Sims' compliance or noncompliance with the notice provisions of that contract.  Without a jury verdict on that point, now is not the time to issue a decree addressing

Employers Mutual's possible duty to indemnify Sims for "personal injury." Summary judgment will be denied as it relates to that issue.

PART SEVEN

*Conclusion*

In accordance with the foregoing, Employers Mutual's motion for summary judgment will be granted to the extent that Employers Mutual seeks a declaration that it has no duty to defend the Town of Leighton under either policy of insurance, or to defend Sims under the CGL Policy.  The motion also will be granted insofar as Employers Mutual seeks a declaration that it has no duty to defend Sims against any claim for "property damage" under the Linebacker Policy.  Conversely, to the extent Employers Mutual's requests a declaration that it has no duty under the Linebacker Policy to defend Sims against allegations of "personal injury" (which includes certain types of "bodily injury"), its motion will be denied.  This action will proceed to trial on the sole issue of whether Sims violated the notice provisions of the Linebacker Policy.[98]

With respect to the duty to indemnify, Employers Mutual's motion for

---

[98] If a jury determines that Sims had a reasonable excuse for not providing notice, then Employers Mutual will be obligated to defend him against Vines' claims of "personal injury" (including "bodily injury" stemming from her arrest).  If a jury renders a verdict adverse to Sims on the notice issue, Employers Mutual will be relieved of all obligations under the Linebacker Policy.

summary judgment against the Town will be granted as to both policies, and against Sims as to any allegations of "property damage" under the Linebacker Policy. The motion will be denied, however, as it relates to the duty to indemnify Sims under the CGL Policy or the "personal injury" coverage part of the Linebacker Policy. Further, that portion of the declaratory judgment complaint that seeks a decree on the duty to indemnify Sims pursuant to the CGL Policy will be dismissed as unripe. *See All Seasons Window & Door*, 387 F. Supp. 2d at 1212 (choosing dismissal without prejudice over a stay). An appropriate order will be entered contemporaneously herewith.

DONE this 12th day of February, 2007.

_____
United States District Judge

-53-